William Charles PAYTON,
Petitioner–Appellee,

v.

Jeanne WOODFORD, Warden,
Respondent–Appellant.

William Charles Payton, Petitioner–
Appellant,

v.

Jeanne Woodford, Warden,
Respondent–Appellee.

Nos. 00–99000, 00–99003.

United States Court of Appeals,
Ninth Circuit.

Filed Oct. 20, 2003.

Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Senior Assistant Attorney General, Frederick R. Millar, Jr., Deputy Attorney General, A. Natasha Cortina, Deputy Attorney General, Nancy L. Palmieri, Deputy Attorney General, Esteban Hernandez, Deputy Attorney General, San Diego, California, for respondent-appellant Jeanne S. Woodford.

Maria E. Stratton, Federal Public Defender, Dean R. Gits, Deputy Federal Public Defender, Office of the Federal Public Defender, Los Angeles, California, and Rosalie L. Rakoff, A Professional Corporation, Santa Monica, California, for petitioner-appellee William Charles Payton.

On Remand from the United States Supreme Court.

Before SCHROEDER, Chief Judge, PREGERSON, KOZINSKI, TROTT, FERNANDEZ, T.G. NELSON, TASHIMA, W. FLETCHER, PAEZ, BERZON and TALLMAN, Circuit Judges.

Opinion by Judge PAEZ; Dissent by Judge TALLMAN

## OPINION

PAEZ, Circuit Judge:

A California jury convicted William Charles Payton ("Payton") of the first degree murder and rape of Pamela Montgomery and the attempted murder of Patricia Pensinger and her son, Blaine Pensinger. Payton was sentenced to death. Payton appealed both his underlying conviction and death sentence.

On direct appeal, the California Supreme Court affirmed both his conviction and his sentence. *People v. Payton*, 3 Cal.4th 1050, 13 Cal.Rptr.2d 526, 839 P.2d 1035 (1992). Payton filed a petition for a writ of habeas corpus and a subsequent amended habeas petition in federal district court, pursuant to 28 U.S.C. § 2254, after exhausting his state court remedies.

Payton raised several arguments in his habeas petition relating to the guilt and penalty phases of his trial. At issue here is Payton's contention that the jury did not consider, in imposing the death penalty, potentially mitigating evidence of his post-crime religious conversion and good behavior in prison. The California death penalty statute contains an eleven-factor test that requires the jury to weigh and balance specific aggravating and mitigating circumstances in deciding whether to impose the death penalty. The first ten factors instruct the judge or jury to evaluate various circumstances specific to the crime and to account for the defendant's age and prior convictions. The eleventh factor—factor (k)—functions as a catchall factor,

enabling the judge or jury to consider any other circumstance that the defendant presents in mitigation of a death sentence. During Payton's penalty phase, the trial court used the then-existing model jury instruction that incorporated this multi-factor test. *See* 1 California Jury Instructions, Criminal ("CALJIC") 8.84.1 (4th ed.1979). This instruction simply quotes factor (k) as it exists in the death penalty statute, directing the jury to consider any circumstance "which extenuates the gravity of the crime even though it is not a legal excuse for the crime." *Id.;* Cal.Penal Code § 190.3 (1978). Payton contended that, although the jury instruction enabled the jury to consider pre-crime character and background evidence, *see Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), it limited the permissible scope of factor (k) in such a way as to remove from the jury's consideration the only mitigating evidence he presented during the penalty phase of his trial— evidence of his post-crime religious conversion and good behavior in prison.

The district court rejected Payton's guilt phase arguments but agreed with his penalty phase arguments. The court therefore granted Payton's habeas petition and vacated his death sentence. A three-judge panel of this court, however, disagreed that Payton's penalty phase was fundamentally unfair, reversed the district court, and ordered the writ vacated. *Payton v. Woodford,* 258 F.3d 905 (9th Cir. 2001). We then took this case en banc, adopted the three-judge panel's decision that there were no guilt phase errors, but affirmed the district court's decision with respect to the penalty phase. We agreed

with the district court that there was error during Payton's penalty phase, and we affirmed the grant of Payton's habeas petition. *Payton v. Woodford ("Payton I"),* 299 F.3d 815 (9th Cir.2002) (en banc).

In our initial en banc opinion, we held that the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1218 (April 24, 1996) ("AEDPA"), did not apply to our analysis of Payton's habeas claims because Payton filed his petition for the appointment of habeas counsel prior to April 24, 1996, the effective date of AEDPA. *See Payton,* 299 F.3d at 822. In reaching this conclusion, we relied on our prior decision in *Calderon v. United States District Court ("Kelly"),* 163 F.3d 530, 540 (9th Cir.1998) (en banc), in which we held that a petition for appointment of habeas counsel coupled with a motion for a stay of execution was sufficient for fixing the date for determining when AEDPA applies. After *Payton I,* the Supreme Court issued its decision in *Woodford v. Garceau,* 538 U.S. 202, 123 S.Ct. 1398, 1402–03, 155 L.Ed.2d 363 (2003), in which it held that cases are "pending" before the effective date of AEDPA only if a habeas petitioner has filed an "actual application for habeas corpus relief" in district court; a petition for the appointment of habeas counsel is not enough. In light of its decision in *Woodford v. Garceau,* the Supreme Court granted a writ of certiorari in *Payton I,* vacated the judgment, and remanded the case to us for further consideration. *See Woodford v. Payton,* —— U.S. ——, 123 S.Ct. 1785, 155 L.Ed.2d 662 (2003).

This opinion ("*Payton II*") reflects our decision on remand.[1] Here, we apply the

---

1. In this opinion, as in our prior en banc opinion, we address only Payton's habeas claims relating to the penalty phase of his trial. Payton raised several challenges to the guilt phase of his trial and contested his underlying conviction. The district court found no constitutional error in his conviction. In

appeal No. 00–99003, Payton challenges the district court's rulings rejecting his claims of ineffective assistance of counsel, prosecutorial misconduct during the guilt phase of the trial, and the cumulative effects of the alleged constitutional errors. The panel affirmed the dis-

strict AEDPA standard to our analysis of Payton's habeas claims and conclude, as we did in *Payton I,* that the district court properly granted Payton's habeas petition.

## BACKGROUND INFORMATION[2]

In 1980, while spending the night at Patricia Pensinger's home, Payton raped Pamela Montgomery and stabbed her to death. He then entered the bedroom of Pensinger and her son Blaine, stabbed each of them repeatedly, and fled. Payton was charged with the first degree murder and rape of Montgomery and the attempted murders of Pensinger and her son.

At the guilt phase of Payton's jury trial, the prosecution presented testimony from the law enforcement officers who observed the crime scene, forensics experts who confirmed that saliva and semen samples taken from Montgomery's body were consistent with Payton's, Patricia and Blaine Pensinger who gave victims' accounts of the attacks, Payton's wife, who stated that soon after the attacks she saw blood on Payton's clothes, face, hands and penis as well as fingernail scratches and digs on his legs and back, and a fellow inmate, Alejandro Garcia, who recounted that Payton admitted that he raped and stabbed Montgomery and stabbed the Pensingers because he "had this urge to kill." The defense called no witnesses, and the jury convicted on all counts.

During the penalty phase, the prosecution presented as a witness a fellow inmate who testified to his jailhouse conversations with Payton in which Payton admitted that he had "severe problems with sex and women," that he wanted to "stab them and rape them," and that every "wom[a]n on the street he [saw] was a potential victim, regardless of age or looks." Payton's former girlfriend related that she had once awakened to find Payton holding a kitchen knife to her neck, and that he had stabbed her chest and arms. After she pushed him off, he stayed with her and held a towel around her bleeding arm until the police arrived.

The defense presented eight witnesses, including Payton's pastor, a deputy sheriff, four inmates, his mother, and the director of a religious organization ministering to prisoners. Their testimony, taken as a whole, tended to show that Payton had been "born again," made a sincere commitment to God, and was performing good works in jail.

Payton's pastor testified that in his opinion, Payton's conversion was credible and that he was "sincere in his statement and commitment to the Lord." The director of a religious outreach organization ministering to prisoners testified to her numerous conversations with Payton about his spiritual commitment and its manifestation in the bible study groups he established with other inmates. She described his conversion of other inmates, his admission to a correspondence bible college, and his writings.

Four inmates testified that they believed that Payton's religious conversion was sincere and that he had a calming influence on other inmates. One testified that Payton's intervention prevented him from committing suicide. A deputy sheriff assigned to Payton's jail facility related that Payton led prayer meetings and had a positive influence on other inmates. Pay-

---

trict court's rulings on these issues, as do we. We adopt the panel's reasoning on the guilt phase issues as our own. *See Payton,* 258 F.3d at 919–25.

**2.** We summarize the pertinent facts only briefly. The facts surrounding Payton's conviction are set forth in detail in the opinions of the panel and the California Supreme Court. *Payton,* 258 F.3d at 910–14; *Payton,* 13 Cal.Rptr.2d 526, 839 P.2d at 1039–40.

ton's mother described praying together with her son and discussing religion on a weekly basis. Asked if she had noticed a change in her son, she responded: "Oh, yes.... He's totally immersed in the Lord.... He's an instrument of the Lord as far as he's concerned."

Prior to closing arguments in the penalty phase, the judge held an in-chambers conference with the attorneys about the jury instructions. They discussed the application of the multi-factor CALJIC instruction (No. 8.84.1) that guides the jury in determining whether to impose a sentence of life imprisonment or death.[3] Factor (k), the eleventh and final factor, directed that the jury consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." CALJIC 8.84.1. Payton's counsel sought an amendment to the instruction that expressly would have directed the jury to consider "evidence of the defendant's character, background, history, mental condition and physical condition."[4] Although the trial judge agreed with the defense counsel's interpretation of factor (k), he declined the request because he was reluctant to alter the instruction insofar as it reflected verbatim the text of California Penal Code § 190.3. He stated that he would allow counsel to argue the point. The judge also denied defense counsel's separate proposal to amend the instruction to permit the jury to consider Payton's "potential for rehabilitation."

During closing argument, the prosecutor argued to the jury that factor (k) applied to "some factor at the time of the offense that somehow operates to reduce the gravity for what the defendant did" but that it did not "refer to anything after the fact or

---

**3.** The instruction provided in full:

In determining which penalty is to be imposed on[each] defendant, you shall consider all of the evidence which has been received during any part of the trial of this case,[except as you may be hereafter instructed]. You shall consider, take into account and be guided by the following factors, if applicable:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.
(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.
(c) The presence or absence of any prior felony conviction.
(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.
(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.
(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects [*sic*] of intoxication.
(i) The age of the defendant at the time of the crime.
(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.
(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.
CALJIC 8.84.1. In his instructions to the jury, the trial judge omitted the bracketed word "each" and retained the bracketed phrase "except as you may be hereafter instructed."

**4.** The proposed amendment read: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, including evidence of the defendant's character, background, history, mental condition and physical condition."

later." He asserted that factor (k) did not encompass Payton's conversion to Christianity and good conduct in jail because they occurred "well after the fact of the crime," and the factor "seems to refer to a fact in operation at the time of the offense." At one point, the prosecutor said:

> What I am getting at, you have not heard during the past few days any legal evidence of mitigation. What you've heard is just some jailhouse evidence to win your sympathy, and that's all. You have not heard any evidence of mitigation in this trial.

Concluding, the prosecutor told the jury that he did not "want to spend too much time on [Payton's religious conversion] because I don't think it's really applicable and I don't think it comes under any of the eleven factors."

In response to the prosecutor's factor (k) argument, the defense moved for a mistrial, objecting that the prosecutor's argument was "completely contrary to what we all agreed in chambers on the record 'k' was designed to apply to." The court responded that it was a "fair comment on either side" and "I think you can argue it either way." The court told the jury that "the comments by both the prosecution and the defense are not evidence. You've heard the evidence and, as I said, this is argument. And it's to be placed in its proper perspective."

Defense counsel's closing argument acknowledged that factor (k) "may be awkwardly worded." He argued that the factor was designed as a catch-all to include the kind of evidence in mitigation he had presented, and that, for Payton, it was the most critical of the factors.

After the closing arguments, the judge instructed the jury as noted above. Upon receiving instructions that it must reach a unanimous result, the jury retired to deliberate. The jury returned a verdict of death.

## DISCUSSION

### I.

Payton filed his habeas petition on May 6, 1996, after the effective date of AEDPA. In light of *Woodford v. Garceau*, 538 U.S. 202, 123 S.Ct. at 1402, AEDPA therefore applies to our analysis of Payton's habeas claims.

■ The California Supreme Court, in a published opinion, addressed the merits of Payton's factor (k) claims [5] and concluded that there was no instructional error at trial. *See Payton*, 13 Cal.Rptr.2d 526, 839 P.2d at 1049. According to AEDPA, we must determine whether the California Supreme Court's adjudication of these claims either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,[6] as determined by the Supreme Court

---

5. After *Payton*, the California Supreme Court decided *People v. Easley*, 34 Cal.3d 858, 196 Cal.Rptr. 309, 671 P.2d 813, 826 n. 10 (1983), in which it held that trial courts should inform the jury that factor (k) includes any mitigating background and character evidence that the defendant presents in his or her defense. In light of *Easley*, the factor (k) instruction was amended to ensure that the jury consider "any sympathetic or other aspect of the defendant's character or record [that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." *See* CALJIC 8.85(k) (6th ed.1996). We refer

to the factor (k) instruction as it existed prior to this amendment as "unadorned."

6. "Clearly established" federal law refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003). "While Supreme Court precedent is the only authority that is controlling under AEDPA, we look to Ninth Circuit case law as 'persuasive authority for purposes of determining whether a particular state court decision is an "unreasonable application" of Supreme Court law.' " *Davis v.*

of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). The "unreasonable application" prong, which guides our analysis here, "permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, — U.S. —, — —, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Id.* at 2535 (quoting *Lockyer*, 538 U.S. 63, 123 S.Ct. at 1175). "Unreasonable application" means that the state court's application of clearly established Supreme Court precedent was "objectively unreasonable." *Id.; see also Lockyer*, 538 U.S. 63, 123 S.Ct. at 1175.

We hold that the California Supreme Court unreasonably applied "clearly established" Supreme Court precedent to the facts of this case.

**A. Controlling Supreme Court Precedent**

■ "[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604,

98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (emphasis in original); *see also Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). That is, the Eighth and Fourteenth Amendments require "individualized consideration of mitigating factors" in capital cases. *Lockett*, 438 U.S. at 606, 98 S.Ct. 2954; *see also Penry v. Lynaugh*, 492 U.S. 302, 317, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *Eddings*, 455 U.S. at 112, 102 S.Ct. 869. "Relevant mitigating evidence" includes evidence about a defendant's likely future behavior in prison. *See Skipper*, 476 U.S. at 7, 106 S.Ct. 1669 ("A defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination.").

Supreme Court precedent in force at the time the California Supreme Court decided Payton's factor (k) arguments required that *all* potentially relevant mitigating evidence—pre-crime *and* post-crime—be available to the sentencer in a capital case. "Moreover, *Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. *The sentencer must also be able to consider and give effect to that evidence in imposing sentence.*" *Penry*, 492 U.S. at 319, 109 S.Ct. 2934 (emphasis added).

The Supreme Court had occasion to analyze the factor (k) instruction at issue here in *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Specifically, the Court addressed "whether petitioner's capital sentencing proceedings violated the Eighth Amendment because the

---

*Woodford*, 333 F.3d 982, 990–91 (9th Cir. 2003) (quoting *Luna v. Cambra*, 306 F.3d 954,

960 (9th Cir.), *amended by* 311 F.3d 928 (9th Cir.2002)) (internal quotation marks omitted).

trial court instructed the jury in accordance with former CALJIC 8.84.1, including the 'unadorned' factor (k)." 494 U.S. at 377, 110 S.Ct. 1190. Boyde contended that factor (k) did not allow the jury to consider and give effect to non-crime-related mitigating evidence, such as his impoverished and deprived childhood and difficulties in school, because the instruction limited the jury to considering only evidence related to the crime. *Id.* at 378, 381, 110 S.Ct. 1190. The Court established a standard for reviewing jury instructions that allegedly are "ambiguous and therefore subject to an erroneous interpretation"—"whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 380, 110 S.Ct. 1190. Applying this standard to factor (k), "standing alone," the Court concluded that "there is not a reasonable likelihood that Boyde's jurors interpreted the trial court's instructions to prevent consideration of mitigating evidence of background and character."[7] *Id.* at 381, 386, 110 S.Ct. 1190.

### B. The California Supreme Court's Application of Controlling Supreme Court Precedent

■ The California Supreme Court addressed Payton's argument that "the trial court's instructions and the prosecutor's argument led the jurors to believe, incorrectly, that they were not permitted to consider [his] mitigating evidence." 13 Cal.Rptr.2d 526, 839 P.2d at 1047. The

court acknowledged the teachings of *Eddings, Lockett,* and *Skipper* that the Eighth Amendment requires the sentencer in a capital case to consider evidence of character and background, including "good behavior in prison." *Id.* at 1070. In analyzing Payton's claims, however, it focused entirely on the Supreme Court's decision in *Boyde, id.* at 1070–73, which was an unreasonable application of "clearly established" Supreme Court precedent because *Boyde* does not control this case and, in focusing almost exclusively on *Boyde,* the court did not give proper effect to clearly established Supreme Court cases such as *Skipper* and *Penry* that are controlling here.

*Boyde* does not control this case for several reasons. First, this case concerns *post-crime* mitigating evidence such as the evidence the Supreme Court considered in *Skipper.*[8] *Boyde,* however, addressed whether there was a reasonable likelihood that the jury applied factor (k) in a way that prevented it from considering *pre-crime* background evidence. The Court relied on "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse.*" *Id.* at 382, 110 S.Ct. 1190 (quoting *Penry,* 492 U.S. at 319, 109 S.Ct. 2934) (emphasis in original; internal quotation marks omitted). It saw "no reason to believe that reasonable jurors would resist the view, 'long held by society,' that in an

---

**7.** We note that in *Boyde* the trial court explicitly instructed the jury to consider *"any other circumstance* which extenuates the gravity of the crime" and defined "extenuate" as "to lessen the seriousness of a crime as by giving an excuse." 494 U.S. at 381, 382 n. 5, 110 S.Ct. 1190 (emphasis added). The Court concluded that the jury would "naturally consider" mitigating character and background evidence as "any other circumstance" that might

provide such an "excuse." *Id.* at 382 n. 5, 110 S.Ct. 1190.

**8.** Payton's religious conversion was not merely an overnight occurrence. Indeed, a year and nine months elapsed from the date of the crime to the date of Payton's death sentence, during which time Payton's conversion and religious good works took place.

appropriate case such evidence would counsel imposition of a sentence less than death." *Id.* Whereas there may be no reason to doubt, in light of society's "long held" views, that a jury would consider a defendant's pre-crime background in sentencing him, there is reason to doubt that a jury would similarly consider post-crime evidence of a defendant's religious conversion and good behavior in prison.[9]

*Boyde* did not address the question presented here—whether, on its face, the unadorned factor (k) instruction is unconstitutionally ambiguous as applied to *post-crime* evidence.[10] Indeed, the Court explicitly distinguished the character and background evidence at issue there from evidence that "pertain[s] to prison behavior after the crime for which [the petitioner] was sentenced to death, as was the case in *Skipper.*" *Boyde*, 494 U.S. at 382 n. 5, 110 S.Ct. 1190. Any natural reading of the words of the unadorned factor (k) does not support the inclusion of post-crime evidence because mitigation evidence occurring after a crime cannot possibly "extenuate the gravity of the crime." *Boyde's* conclusions about the plain wording of factor (k) and the instruction's obvious inclusion of pre-crime background evidence therefore do not apply in this case.

Second, in *Boyde*, the Court rejected Boyde's argument that the prosecutor's comments at sentencing "reinforced an impermissible interpretation of factor (k)" suggesting to the jury that it could not consider Boyde's mitigating character and background evidence. *Id.* at 384–85, 110 S.Ct. 1190. The Court reasoned that the prosecutor's arguments "are usually billed in advance to the jury as matters of argument, not evidence, ... and are likely viewed as the statements of advocates." *Id.* at 384, 110 S.Ct. 1190. In addition, "[a]rguments of counsel which misstate the law are subject to objection and correction by the court." *Id.* Key to the Court's reasoning was the fact that there was "no objectionable prosecutorial argument." Indeed, the prosecutor never suggested to the jury that it could not consider mitigating evidence of Boyde's character and background. *Id.* at 385, 110 S.Ct. 1190. The prosecutor *"explicitly assumed"* that petitioner's character evidence was a proper factor in the weighing process." *Id.* (emphasis added).

Whereas the prosecutor in *Boyde* conceded that the jury must consider Boyde's mitigating character and background evidence, the prosecutor here repeatedly stated to the jury that factor (k) did *not* encompass Payton's mitigating evidence of his religious conversion and good behavior in prison.[11] For example, after listing the eleven factors in CALJIC 8.84.1, the pros-

---

**9.** Indeed, as Justice Kennard noted in her dissent in *People v. Payton:*

> Unlike evidence of a disadvantaged background, [post-crime] evidence does not fit neatly, if it fits at all, into factor (k), because it is not an "excuse" for the commission of the crime. Thus, the jurors in this case were more likely to be misled when they attempted to apply former CALJIC No. 8.84.1 than were the jurors who evaluated the "disadvantaged background" evidence presented by the defendant in *Boyde*.

839 P.2d at 1057.

**10.** In *Babbitt v. Calderon*, 151 F.3d 1170, 1178–79 (9th Cir.1998), we addressed the application of the factor (k) instruction to evi-

dence of Babbitt's background, character, and history. We noted the holding in *Boyde* that the unadorned factor (k) instruction did not preclude consideration of Boyde's character and background. *Babbitt*, like *Boyde*, however, did not address the applicability of the factor (k) instruction to post-crime mitigating evidence such as Payton's.

**11.** The California Supreme Court evaluated the impact of the prosecutor's comments on the jury on the basis of only *one* of his comments. The court failed to consider the cumulative impact on the jury of all the prosecutor's comments regarding factor (k) and Payton's post-crime mitigating evidence.

ecutor gave his interpretation of factor (k) to the jury:

> 'K' says any other circumstance which extenuates or lessens the gravity of the crime. What does that mean? That to me means some fact ... some factor *at the time of the offense* that somehow operates to reduce the gravity for what the defendant did. *It doesn't refer to anything after the fact or later. That's particularly important here because the only defense evidence you have heard has been about this new born Christianity.* (emphasis added)

After the court overruled the defense attorney's objection to the legal misstatements in the prosecutor's argument, the prosecutor continued arguing to the jury:

> Referring back to 'K' which I was talking about, any other circumstance which extenuates or lessens the gravity of the crime, the only defense evidence you've heard had to do with Defendant's new Christianity and that he helped the module deputies in the jail while he was in custody. *The problem with that is that evidence is well after the fact of the crime and cannot seem to me in any way to logically lessen the gravity of the offense that the defendant has committed.* [The defense] will tell you that somehow that becoming a newborn Christian, if in fact he really believed that took place, makes it a less severe crime, but there is no way that can happen when—under any other circumstance which extenuates or lessens the gravity of the crime, refers—seems to refer to a fact in operation *at the time of the offense.* What I am getting at, *you have not heard during the past few days any legal evidence [of] mitigation.*

What you've heard is just some jailhouse evidence to win your sympathy, and that's all. *You have not heard any evidence of mitigation in this trial.* (emphasis added)

He then specifically told the jury that it had not "heard anything to mitigate what [Payton's] done" and that Payton's *only* mitigating evidence did not fit into factor (k):

> I want to make a few comments about religion, the only evidence put on by the defendant. I don't really want to spend too much time on it because *I don't think it's really applicable and I don't think it comes under any of the eleven factors.* ... (emphasis added) [12]

Indeed, the prosecutor focused the jury's attention on the eleven CALJIC factors, which he argued did not encompass Payton's mitigating evidence:

> You shall consider, take into account and be guided by the applicable *factors* of aggravating and mitigating circumstances upon which you have been instructed. In other words, the *factors* I have just read to you.
>
> &#42; &#42; &#42; &#42;
>
> The jury is expected or supposed to go through a weighing process of the *factors* I have just described. (emphasis added)

The California Supreme Court recognized that the prosecutor "suggested a narrow and incorrect interpretation of factor (k)," but it reasoned that "[a]ny impact this argument may have had ... was immediately blunted by defense counsel's objection, which led the court to remind the jury that lawyers' comments were 'not evidence' but 'argument,' and 'to be placed in [their] proper perspective.'" [13] 13 Cal.

---

**12.** We note that the prosecutor's statement appears directly to contradict the California Supreme Court's determination that "the prosecutor implicitly conceded the relevance of defendant's mitigating evidence by devot-ing substantial attention to it." 13 Cal. Rptr.2d 526, 839 P.2d at 1049.

**13.** The Supreme Court reiterated in *Boyde* the well-established principle that the statements

Rptr.2d 526, 839 P.2d at 1048. This was an unreasonable application of *Boyde*.[14]

According to *Boyde*, "the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made." 494 U.S. at 385, 110 S.Ct. 1190. In *Boyde*, the factor (k) instruction potentially was ambiguous but the prosecutor correctly stated in his argument that the jury must consider Boyde's mitigating character and background evidence, thus clarifying the scope of the instruction. Here, however, the jury was confronted with an ambiguous factor (k) instruction and with post-crime mitigating evidence that, unlike the pre-crime character and background evidence in *Boyde*, did not fit clearly within the plain wording of the instruction. On top of this, the court explicitly authorized the prosecutor to argue that Payton's post-crime mitigating evidence could not be considered under factor (k), overruled defense counsel's objection to the prosecutor's legal misstatements, and failed to instruct the jury that it must consider and give effect to Payton's post-crime mitigating evidence.[15] This is not a

---

of attorneys "are usually billed in advance to the jury as matters of argument . . . and as the statements of advocates." 494 U.S. at 384, 110 S.Ct. 1190. Moreover, the "arguments of counsel generally carry less weight with a jury than do instructions from the court." *Id.* It was an unreasonable application of *Boyde* for the California Supreme Court to assume that the jury, which received instructions that both attorneys' statements were merely argument and not evidence, would accord more weight to defense counsel's argument, containing correct statements of the law with respect to factor (k), such as to "blunt" the effect of the prosecutor's legal misstatements about factor (k). *See Payton*, 13 Cal.Rptr.2d 526, 839 P.2d at 1048–49. According to *Boyde*, only instructions by the court have the force to "blunt" attorneys' comments. Here, however, the trial court provided no clarifying instructions as to the proper scope of factor (k) to "blunt" the prosecutor's legally erroneous statements.

**14.** The court reasoned that it was unlikely that "reasonable jurors would believe the court's instructions transformed all of[defendant's] favorable testimony into a virtual charade." 13 Cal.Rptr.2d 526, 839 P.2d at 1049 (quoting *Boyde*, 494 U.S. at 383, 110 S.Ct. 1190) (internal quotation marks omitted; alteration in original). In *Boyde*, however, the jury received only an ambiguous factor (k) instruction. Here, in contrast, the jury received not only an ambiguous factor (k) instruction, but also explicit, repeated arguments by the prosecutor that the defense had presented no mitigating evidence and that post-crime mitigating evidence does not fit into factor (k). This, coupled with the court's instruction, *see infra*, that the jury consider

the arguments of counsel, calls into doubt the court's apparent certainty that the jury did not ignore Payton's mitigating evidence.

**15.** Defense counsel stated: "My only problem is I think we all agree that that's the law [that factor (k) includes Payton's post-crime mitigating evidence], but the jury's not going to know." The judge replied, "I agree with you." The judge then stated: "I see your position for the edification and clarification of the jury. But I'm going to refuse, as I said, to modify the [factor (k)] instruction . . . I assume *you gentlemen* . . . in your *argument* can certainly relate—relate back to those factors and certainly can argue the defendant's character, background, history, mental condition, physical condition; certainly fall into category 'k' and certainly make a clear argument to the jury." (emphasis added) The court also instructed the jury to weigh the CALJIC factors, but never explicitly clarified that the jury could consider Payton's post-crime mitigating evidence under factor (k) even though the court agreed with defense counsel that factor (k) encompassed this evidence:

In determining the penalty to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial in this case, *except as you may be hereafter instructed.* You shall consider, take into account and be guided by the following *factors*, if applicable[lists (a) through (k)].

\* \* \*

After having heard all of the evidence and after having heard *and considered the argument of counsel*, you shall consider, take into account and be guided by the applicable *factors* of aggravating and mitigating

case in which the prosecutor made an off-hand remark during the course of trial. The prosecutor's erroneous argument was far from subtle. It was explicit, deliberate, consistent, and repeated. Indeed, the jury was presented with the prosecutor's and the defense attorney's conflicting arguments about whether it legally could consider Payton's mitigating evidence under factor (k),[16] and the court left it up to the *jury* to choose which version of the law to apply. When the court expressly permits counsel to argue the legal meaning of an instruction, without ever instructing the jury which interpretation is correct, the arguments of counsel obviously take on significant importance. A lay jury is ill-equipped to determine which view of the law is correct.[17] *See Griffin v. United States,* 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) ("When ... jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error."); *Penry,* 492 U.S. at 328, 109 S.Ct. 2934 (" 'When the choice is between life and death, that risk [that the death penalty will

be imposed in spite of factors which may call for a less severe penalty] is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.' " (quoting *Lockett,* 438 U.S. at 605, 98 S.Ct. 2954)).

In this context, there was a reasonable likelihood that, as a result of the prosecutor's legally erroneous arguments and the court's failure to correct the arguments with proper jury instructions, the jury did not consider and give effect to the post-crime mitigating evidence of Payton's religious conversion and good behavior in prison. This was constitutional error. *See Penry,* 492 U.S. at 326, 109 S.Ct. 2934 (reversing a death sentence and remanding for resentencing because, on the basis of the prosecutor's argument and the absence of appropriate jury instructions, "a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence"); *Skipper,* 476 U.S. at 5, 106 S.Ct. 1669 (holding that post-crime evidence that a defendant would not pose a danger in prison "must be considered po-

---

circumstances upon which you have been instructed.
(emphasis added)

As Justice Kennard pointed out in her dissent in *People v. Payton:*

The court's statement to the jury that its considerations of "all of the evidence" should be guided by "the arguments of counsel" and "the applicable factors of aggravating and mitigating circumstances," was tantamount to an instruction to the jury that its power to consider the evidence was not unlimited. This instruction could only strengthen the prosecutor's erroneous and repeated argument to the jury that it could not legally consider defendant's mitigating evidence, and the jury may well have acted accordingly.

839 P.2d at 1058.

**16.** Because a natural reading of the unadorned factor (k) instruction already favored

the prosecutor's interpretation, defense counsel faced a prodigious hurdle in trying to convince the jury of the proper interpretation.

**17.** As the dissent noted in *People v. Payton:*

The trial court's ruling was wrong. The proper scope of factor (k) is a question of *law,* not of fact. It is the trial court's duty to explain the law to the jury, not to place upon the jury the impossible burden of deciding which of two inconsistent views of the law is correct. The jurors in this case were laypersons; presumably they were unfamiliar with the legislative history of factor (k) or with cases interpreting the Eighth Amendment. Thus, they were totally unequipped to decide whether the prosecutor or defense counsel had correctly explained to them which evidence they were entitled to consider in deciding whether defendant should live or die.

839 P.2d at 1057.

tentially mitigating" and "may not be excluded from the sentencer's consideration"); *Eddings,* 455 U.S. at 114–15, 102 S.Ct. 869 (holding that the sentencer in a capital case may not "refuse to consider, *as a matter of law,* any relevant mitigating evidence" and may not give such evidence "no weight"); *Lockett,* 438 U.S. at 608, 98 S.Ct. 2954 (striking down Ohio's death penalty statute as violating the Eighth and Fourteenth Amendments due to its "limited range of mitigating circumstances which may be considered by the sentencer" and its preclusion from consideration of other relevant mitigating factors). The California Supreme Court's conclusion to the contrary, on the basis of *Boyde,* which did not address improper legal argument by a prosecutor or a court's failure to provide jury instructions to correct the attorney's legally erroneous argument, was an unreasonable application of "clearly established" Supreme Court precedent. When the effect of a mitigation instruction, viewed in the full context of the trial, is to confuse or mislead the jury in its duty to consider all relevant mitigation evidence, there has been constitutional error.

## II.

■ In light of our conclusion that there was constitutional error, we must now decide whether this error was harmless. We hold that the error was not harmless because it had a "substantial and injurious effect or influence" on the jury's verdict, *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), and we are left with "grave doubt" as to the harmlessness of the error, *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

As an initial matter, we note that our caselaw is not clear as to whether the petitioner, the state, or neither, bears responsibility for demonstrating the significance of the error under the *Brecht/O'Neal* harmlessness standard. *Compare Rodri-*

*guez v. Marshall,* 125 F.3d 739, 744 (9th Cir.1997) (stating that petitioner bears the burden of showing harm); *Franklin · v. Henry,* 122 F.3d 1270, 1273 (9th Cir.1997) (same); *with Keating v. Hood,* 191 F.3d 1053, 1062 (9th Cir.1999) (as amended) (noting that the state bears the burden of showing harmlessness); *Fisher v. Roe,* 263 F.3d 906, 917 (9th Cir.2001) (same); *and with Mancuso v. Olivarez,* 292 F.3d 939, 949 n. 4 (9th Cir.2002) (as amended) (attempting to clarify the inconsistency in our caselaw regarding burdens of proof and concluding that "the reviewing court must determine independently whether a trial error had a substantial and injurious effect, without consideration of burdens of proof"); *Thompson v. Borg,* 74 F.3d 1571, 1575 (9th Cir.1996) (rejecting burdens of proof in favor of an independent determination of whether a trial error had a substantial and injurious effect).

■ It is clear from *O'Neal* that the petitioner does not bear the burden of showing harm. 513 U.S. at 436, 115 S.Ct. 992 ("[W]e note that we deliberately phrase the issue in this case in terms of a *judge's* grave doubt, instead of in terms of 'burden of proof.' ") (emphasis added). Because the harmless error analysis is a purely legal question that lies outside the realm of fact-finding, we dispense with burdens of proof and presumptions. *See id.* at 437, 115 S.Ct. 992 (explaining that the court must determine whether the error affected the judgment "without benefit of such aids as presumptions or allocated burdens of proof that expedite fact-finding at the trial" (quoting R. Traynor, The Riddle of Harmless Error 26 (1970))). *O'Neal* directs us to ask a "conceptually clearer" question in reviewing the record in a habeas case: " 'Do I, the judge, think that the error substantially influenced the jury's decision?' " *Id.* at 436, 115 S.Ct. 992.

In asking this question, we step back to determine where we are on the spectrum

of certainty about the harmlessness of the constitutional error. If we are convinced that "the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.* at 437, 115 S.Ct. 992 (quoting *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). If, on the other hand, we are not fairly assured that there was no effect on the verdict, we must reverse. *Id.* In the "narrow circumstance" in which we are in "grave doubt" as to the effect of the constitutional error, we must assume that there was such an effect, and grant the petition. *O'Neal,* 513 U.S. at 436, 438, 115 S.Ct. 992; *see also Thompson,* 74 F.3d at 1575.

■ In the course of this inquiry, it is the State that bears the "risk of doubt." *O'Neal,* 513 U.S. at 438, 115 S.Ct. 992; *Valerio v. Crawford,* 306 F.3d 742, 762 (9th Cir.2002) (en banc), *cert. denied,* — U.S. ——, 123 S.Ct. 1788, 155 L.Ed.2d 695 (2003). We look to the State to instill in us a "fair assurance" that there was no effect on the verdict. *See Morales v. Woodford,* 336 F.3d 1136, 1148 (9th Cir.2003) ("[T]he state must provide us with a 'fair assurance' that the error was harmless under *Brecht.*"); *Valerio,* 306 F.3d at 762; *see also O'Neal,* 513 U.S. at 443, 115 S.Ct. 992 ("[T]he State normally bears responsibility for the error that infected the initial trial."). Only if the State has persuaded us that there was no substantial and injurious effect on the verdict do we find the error harmless.

This framework is faithful to the balance the Supreme Court has struck between concerns of federal-state comity and finality in state criminal trials, and the irrevers-

ible harm caused by an execution resulting from an unconstitutional error. In weighing these concerns in a non-capital case, the Supreme Court stated:

> [T]he number of acquittals wrongly caused by grant of the writ and delayed retrial (the most serious harm affecting the State's legitimate interests) will be small when compared with the number of persons whom this opposite rule (denying the writ) would wrongly imprison or execute. On balance, we must doubt that the law of habeas corpus would hold many people in prison "in violation of the Constitution," for fear that otherwise a smaller number, not so held, may eventually go free.

*O'Neal,* 513 U.S. at 443, 115 S.Ct. 992. Placing the "risk of doubt" on the state is also consistent with the body of jurisprudence that has placed the burden of showing lack of prejudice on the party who would benefit from the constitutional error. *Id.* at 437–44, 115 S.Ct. 992; *United States v. Olano,* 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (stating that the government bears the "burden of showing the absence of prejudice"); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (noting that "the original common-law harmless-error rule put the burden on the beneficiary of the error . . . to prove that there was no injury"). *Kotteakos,* which articulated the harmlessness standard that *Brecht* later adopted and that we now apply, "places the burden on prosecutors to explain why those errors were harmless." *Brecht,* 507 U.S. at 640, 113 S.Ct. 1710 (Stevens, J., concurring).[18]

Considering the record before us, the State has not provided us with a "fair

---

18. To the extent that they are inconsistent with this opinion, we overrule the statements in *Rodriguez,* 125 F.3d at 744; *Franklin,* 122 F.3d at 1273; and *Thomas v. Hubbard,* 273 F.3d 1164, 1170 (9th Cir.2002) (as amended)

that appear to place the burden on the petitioner to establish that there was harm under *Brecht,* and the statements in *Fisher,* 263 F.3d at 917, and *Keating,* 191 F.3d at 1062, that appear to place the same burden on the State.

assurance" that the error did not prejudice the penalty phase of Payton's trial. *O'Neal,* 513 U.S. at 437–38, 115 S.Ct. 992; *Valerio,* 306 F.3d at 762. On one side of the balance sheet is the State's evidence of aggravating circumstances. There is no question that this was a brutal crime. The prosecution introduced eyewitnesses to Payton's actions, testimony as to his motives and character, and forensic and other evidence to demonstrate to the jury the devastating effects of the crime.

It is the other side of the balance sheet that undermines any assurance that the jury's verdict was not affected. As required by California Penal Code § 190.3, the trial court further instructed the jury that "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *shall impose* a sentence of death." We have determined that there is a reasonable likelihood that the jury accepted the prosecutor's erroneous statement of the law rather than the defense counsel's and that it therefore failed to consider the only evidence offered in mitigation of the death penalty. That left the jury bereft of any countervailing evidence to weigh against the prosecution's evidence of aggravating circumstances.

We cannot know whether the jury would have returned a verdict of life or of death had it been properly instructed. Payton's extensive evidence of his conversion to Christianity, positive influence on other inmates, and other good works in jail were offered to evoke to the jury his potential for rehabilitation.[19] If the jury had been inclined to weigh favorably evidence of redeeming features of his character or his conduct while in custody pending trial, it

would have felt constrained by law from considering that evidence. Without Payton's mitigating evidence, the jury was bound by California Penal Code § 190.3 to impose a death sentence. *See Easley,* 196 Cal.Rptr. 309, 671 P.2d at 827.

Having pondered "all that happened without stripping the erroneous action from the whole," *O'Neal,* 513 U.S. at 437, 115 S.Ct. 992 (quoting *Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. 1239), we do not arrive at a fair assurance that the error was harmless. As we have previously stated, "[b]ecause a death sentence is qualitatively different from other forms of punishment, there is a greater need for reliability in determining whether it is appropriate in a particular case." *Coleman v. Calderon,* 210 F.3d 1047, 1050 (9th Cir.2000); *see also Mills v. Maryland,* 486 U.S. 367, 376, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) ("In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds."). Far from a fair assurance that the error was harmless, the "possible jury confusion" arising from the trial court instruction leaves us in "grave doubt about the likely effect of [the] error on the jury's verdict." *O'Neal,* 513 U.S. at 435, 115 S.Ct. 992; *see also Fisher,* 263 F.3d at 917–18. We therefore conclude that the instructional error had a "substantial and injurious effect or influence on the jury's verdict" that necessitates a new penalty phase trial. Payton is entitled to a penalty trial before a jury that is properly instructed that it must take his post-crime evidence into account in determining whether to impose a sentence of life or death.

---

**19.** We note that the mitigating evidence strongly suggested that Payton's religious conversion was more than merely a "miracle on the cellblock." Ultimately, however, resolving the question of the depth of Payton's beliefs demands the kind of sifting and weighing of the evidence that is the jury's exclusive realm. *See Skipper,* 476 U.S. at 9, 106 S.Ct. 1669 (remanding for new penalty phase trial when exclusion of post-crime mitigating evidence "impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender").

## CONCLUSION

Accordingly, we AFFIRM the judgment of the district court granting Respondent's motion for summary judgment as to all claims except Claim IVB, item 3 of the petition for habeas corpus, and granting the writ of habeas corpus as to the penalty phase of the trial.

AFFIRMED.

TALLMAN, Circuit Judge, dissenting in part, joined by Circuit Judges KOZINSKI, TROTT, FERNANDEZ, and T.G. NELSON:

Today, six judges of this court announce that the legal conclusion reached by *seven* of their colleagues [1] (*plus* five justices of the California Supreme Court) is not only wrong, but *objectively unreasonable* in light of clearly established federal law. According to the six judges in the majority, those twelve judges were so off-the-mark in their analyses of United States Supreme Court precedent that their shared legal conclusion—that Payton's constitutional rights were not violated by the "unadorned" factor (k) instruction— must be deemed objectively unreasonable. I respectfully dissent.[2]

## I

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1218, (AEDPA) significantly limited the power of the federal bench to grant a state prisoner's petition for habeas corpus. Post AEDPA, the successful habeas applicant must convince the federal judge or appellate panel that the state court decision upholding his conviction or sentence is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The majority holds that the California Supreme Court unreasonably applied Supreme Court precedent in upholding Payton's sentence of death. Maj. Op. at 1215. In order for the majority to reach this conclusion, it must have decided that the California Supreme Court's holding was "more than incorrect or erroneous," for the "unreasonable application" clause of § 2254(d)(1) means "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 1174, 155 L.Ed.2d 144 (2003). "It is not enough that a federal habeas court, in its independent review of the legal question is left with a firm conviction that the state court was erroneous." *Id.* at 1175 (citation and quotation marks omitted); *see also Woodford v. Visciotti*, 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) ("Under § 2254(d)'s 'unreasonable application' clause, a federal

---

**1.** *See* 299 F.3d 815, 830 (9th Cir.2002) (en banc) (Tallman, J., dissenting in part, joined by Judges Kozinski, Trott, Fernandez, and T.G. Nelson); 258 F.3d 905, 910 (9th Cir. 2001) (Rymer, J., joined by Gould, J.)

**2.** I concur in the court's decision not to disturb the underlying conviction and to reject most of Payton's challenges to both his conviction and sentence. Maj. Op. at n. 1. No one supports Payton's argument that he received ineffective assistance of counsel at either the guilt or penalty stages of trial. Even though defense counsel did not present any witnesses, not a single member of this en banc panel believes that Payton was prejudiced during the guilt phase in light of the overwhelming evidence against him. Nor does a single judge believe "there is a reasonable probability that, absent [any errors of defense counsel], the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland v. Washington*, 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [United States Supreme Court precedent] incorrectly.").

Did the California Supreme Court *unreasonably* apply United States Supreme Court precedent? Certainly not.

The California Supreme Court explicitly acknowledged the Eighth Amendment requirement that a sentencing jury in a capital case consider mitigating character and background evidence. *People v. Payton*, 3 Cal.4th 1050, 13 Cal.Rptr.2d 526, 839 P.2d 1035, 1047–48 (1992). Then, applying the United States Supreme Court's decision in *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the California Supreme Court concluded that it was not "reasonably likely that the jurors believed the law required them to disregard [Payton's] mitigating evidence." *Id.* at 1048. In other words, the California Supreme Court determined that Payton's jury heard and considered Payton's mitigating evidence before deciding that death was warranted.

The California Supreme Court's application of the *Boyde* decision was not only reasonable but correct. In *Boyde*, the United States Supreme Court upheld against an Eighth Amendment challenge the same CALJIC jury instruction employed in Payton's penalty trial. The central issue in *Boyde*, as in Payton's case, was whether factor (k)'s language limits

the jury to consideration of evidence only directly related to the crime. The United States Supreme Court emphatically rejected such a reading. *See Boyde*, 494 U.S. at 382, 110 S.Ct. 1190 ("The instruction did not, as petitioner seems to suggest, limit the jury's consideration to 'any other circumstance *of the crime* which extenuates the gravity of the crime.' The jury was directed to consider *any other circumstance* that might excuse the crime, which certainly includes a defendant's background and character.") (emphases in original); *see also id.* at 383, 110 S.Ct. 1190 (finding it "improbable that jurors would arrive at an interpretation that [factor (k)] precludes consideration of all non-crime-related evidence").

Though perhaps it could have, the California Supreme Court did not cite to *Boyde* and end its analysis. Recognizing that "*Boyde* does not prevent a defendant from asserting a claim to the effect that prosecutorial argument, or other factors, led the jury to misinterpret factor (k)," *Payton*, 13 Cal.Rptr.2d 526, 839 P.2d at 1048, the court took pains to explain that no misinterpretation occurred here.

First of all, the court stated that the impact of the prosecutor's erroneous argument (that post-crime mitigating evidence should not be considered by the jury) was "blunted" by defense counsel's objection and the trial court's admonition to the jury that counsels' arguments were not evidence.[3] *Payton*, 13 Cal.Rptr.2d 526, 839

---

**3.** In closing argument the prosecutor incorrectly stated that factor (k) "doesn't refer to anything after the fact or later," whereupon the trial court immediately admonished the jury that comments made by counsel were argument, not evidence. I do not understand why we should not accord this standard admonishment the respect we normally afford it in non-capital cases. Jurors are presumed to follow such admonitions absent specific proof that they did not. *See Weeks v. Angelone*, 528

U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000).

The prosecutor's arguments were also of concern in *Boyde*, and the Supreme Court stated:
[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the

P.2d at 1048. Second, the court noted that the prosecutor's own statements lessened the impact of the erroneous argument. "[T]he prosecutor implicitly conceded the relevance of [Payton's] mitigating evidence by devoting substantial attention to it." [4] *Id.* at 1049. Third, and perhaps most significant, the court explained that the jury was unlikely to ignore Payton's mitigating evidence—regardless of the ambiguous factor (k) instruction or the prosecutor's arguments—since doing so would have turned the penalty phase "into a virtual charade." The court stated:

> For the jury to have accepted a narrow view of factor (k) in this case would have meant disregarding all of defendant's mitigating evidence, since the testimony of his eight penalty phase witnesses was all directed to his religious conversion and consequent behavior in prison. Indeed, it would have meant disregarding virtually the entire penalty phase, since the testimony of the prosecution's two witnesses occupies only eleven pages of the transcript. We think it unlikely, however, as did the high court in *Boyde*, "that reasonable jurors would believe the court's instructions transformed all of [Payton's] 'favorable testimony into a virtual charade.'"

*Id.* (quoting *Boyde,* 494 U.S. at 383, 110 S.Ct. 1190). Moreover, the court noted that the trial court "instructed the jury to consider '*all* of the evidence which has been received during any part of the trial' in determining the penalty." *Id.* (quoting *Boyde,* 494 U.S. at 383, 110 S.Ct. 1190) (emphasis added). The trial court's admonition to consider *all* the evidence buoyed the conclusion that the jury considered Payton's mitigating evidence. Finally, the court noted that Payton's attorney, "in his own closing argument, strongly reinforced the correct view that [Payton's] religious conversion was proper mitigating evidence." *Id.* Defense counsel argued: "[S]ection (k) may be awkwardly worded, but it does not preclude or exclude the kind of evidence that was presented. It's a catch-all phrase. It was designed to include, not exclude, that kind of evidence." *Id.*

After this thorough analysis, the California Supreme Court concluded that "it is not reasonably likely that the jury understood the court's instructions as precluding consideration of defendant's mitigating evidence." *Id.*

How that decision constitutes an unreasonable application of United States Supreme Court precedent is a mystery to

---

law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.

*Boyde,* 494 U.S. at 384–85, 110 S.Ct. 1190 (citations omitted).

4. The prosecutor certainly erred by arguing that the jury had not heard "any legal evidence in mitigation." But for the majority of his closing, the prosecutor did what he should

have done and argued not that jurors could not consider Payton's religious conversion but that they should not *value* it much. The prosecutor argued that the religious conversion would not seem to "lessen the gravity of the offense"; that the defense evidence was offered "to win [the jury's] sympathy"; that Payton's new-found religion could not undo his bad acts from the past; and that while Payton appealed to the jurors' mercy, he had shown none to his victims. The prosecutor also implicitly acknowledged that the evidence presented by the defense counted for *something* when he stated "[i]f you want to distribute a thousand points over the factors, 900 would have to go to what he did to Mrs. Montgomery."

me. The California Supreme Court identified the correct governing rule—that mitigating background and character evidence may not be precluded from the sentencing jury's consideration—and then decided that the rule was not violated. To reach this decision the California court faithfully followed the dictates of *Boyde,* the most analogous Supreme Court case.

Apparently *Boyde* was the wrong case to apply, for the majority tells us that "*Boyde* does not control this case...." Maj. Op. at 1211. According to the majority, the California Supreme Court was unreasonable because it "did not give proper effect to clearly established Supreme Court cases such as *Skipper [v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986),] and *Penry [v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989),] that are controlling here." *Id.*

Neither *Skipper* nor *Penry* supports the proposition that the California Supreme Court erred, let alone unreasonably applied clearly established federal law. Both cases are plainly distinguishable from the case at bar. In *Skipper,* the trial court *excluded* as irrelevant defense witnesses who would have testified that the defendant had "made a good adjustment" while in prison. 476 U.S. 1, 3, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Payton, in contrast, was not precluded from calling such character witnesses. In fact, Payton called eight witnesses who all testified that Payton had discovered God while in jail.

*Penry,* at least, has somewhat similar facts to this case. There the defendant produced mitigating evidence of his mental retardation and abused childhood but was still sentenced to death. Like Payton, Penry argued that his constitutional rights were violated by inadequate jury instructions, which effectively precluded the jury from considering his mitigating evidence. The instructions posed three questions for the jury to consider: (1) "Did Penry act

deliberately when he murdered [the victim]?" (2) "Is there a probability that he will be dangerous in the future?" (3) "Did he act unreasonably in response to provocation?" 492 U.S. at 320, 109 S.Ct. 2934. If the jury answered all three questions in the affirmative, state law required the trial court to impose a sentence of death. *Id.* at 310, 109 S.Ct. 2934.

According to the Supreme Court, none of these instructions provided the jury "with a vehicle for expressing its 'reasoned moral response' to [Penry's mitigating] evidence in rendering its sentencing decision." *Id.* at 328, 109 S.Ct. 2934. None of the questions allowed the jury to take into account Penry's mental retardation or past child abuse. The first instruction asked the jurors to decide whether Penry acted "deliberately." *Id.* at 322, 109 S.Ct. 2934. However, as the Court noted:

> Personal culpability is not solely a function of a defendant's capacity to act "deliberately." A rational juror ... could have concluded ... that [Penry] deliberately killed [the victim] to escape detection. Because Penry was mentally retarded, however, and thus less able than a normal adult to control his impulses or to evaluate the consequences of his conduct, and because of his history of childhood abuse, that same juror could also conclude that Penry was less "morally culpable than defendants who have no such excuse," but who acted "deliberately" as that term is commonly understood.

*Id.* at 322–23, 109 S.Ct. 2934 (internal quotation marks and citation omitted).

The second question, asking whether Penry would be dangerous in the future, also precluded the jury from considering Penry's mitigating evidence. In fact, Penry's mental retardation and childhood abuse suggested that he would pose a continuing threat to society. *Id.* at 324, 109

S.Ct. 2934 ("Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future."). The final question asked whether Penry's response to the provocation of the victim was unreasonable. The Court held that this instruction similarly did not allow the jury to consider Penry's mitigating evidence because "Penry's mental retardation and arrested emotional development ... would not necessarily diminish the 'unreasonableness' of his conduct. . . ." *Id.*

Unlike the instructions in *Penry,* which on their face precluded the jury from considering the defendant's mitigating evidence, the instructions here allowed Payton's jury to consider "*any other circumstance* which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Cal.Penal Code § 190.3(k) (1978) (emphasis added). In *Boyde*—the case the majority desperately wants to ignore—the United States Supreme Court held that "there is not a reasonable likelihood that Boyde's jurors interpreted the [unadorned factor (k) instruction] to prevent consideration of mitigating evidence of background and character." 494 U.S. at 381, 110 S.Ct. 1190. Post-*Boyde,* one cannot argue that the unadorned factor (k) instruction is constitutionally deficient on its face as were the instructions given in *Penry.* *Penry* does

not control this case. And it certainly does not suggest that the California Supreme Court unreasonably applied United States Supreme Court precedent when it extended *Boyde* to post-crime mitigation evidence.[5]

Why does the majority rely on cases such as *Penry* and *Skipper* while discounting *Boyde,* a case almost directly on point?[6] The reason must be that *Boyde* suggests a different result than the one the majority wants to reach. True, *Boyde* concerned "pre-crime" mitigation evidence whereas this case concerns "post-crime" mitigation evidence. But once one acknowledges, as the Supreme Court did in *Boyde,* that factor (k)'s text allows for consideration of evidence beyond the crime itself, there is no logical reason to believe that post-crime character strengths are any less capable of extenuating the gravity of the crime than pre-crime character strengths.

Moreover, as both the *Boyde* Court and the majority's opinion here recognize, factor (k) allows jurors to consider a defendant's character. And that is basically what Payton's attorney tried to show during the penalty phase—that Payton had undergone a character transformation after being jailed. Witnesses for Payton stated that he turned away from his former evil ways and toward God; he no longer sought to harm and abuse, stab and rape women; instead, he sought to help his

---

5. Other cases cited by the majority, such as *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), are also distinguishable. In *Eddings,* the trial court heard mitigating evidence of the defendant's violent upbringing and emotional disturbance but improperly decided that such evidence could not be considered as a matter of law. 455 U.S. at 109, 102 S.Ct. 869. In *Lockett,* the Court held that the Ohio death penalty statute was unconstitutional be-

cause of "[t]he limited range of mitigating circumstances [provided in the statute] which may be considered by the sentencer . . . ." 438 U.S. at 608, 98 S.Ct. 2954.

6. Though when *Boyde* is helpful to the majority's argument, it is cited and applied. *See* Maj. Op. at 1213–1214 (explaining that the California Supreme Court's conclusion regarding the impact of the prosecutor's argument that factor (k) precluded post-crime mitigation evidence "was an unreasonable application of *Boyde* ").

fellow male inmates. Payton presented a significant amount of evidence to that effect, and the jury listened to it. We must presume the jury considered it. As the *Boyde* Court noted:

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

494 U.S. at 380–81, 110 S.Ct. 1190. Unfortunately for Payton, the jury either did not believe this miracle on the cellblock or did not value it much in comparison to the horrific crimes he committed.

Perhaps I am wrong and the majority is correct that *Boyde* is distinguishable from this case because it concerned pre-crime mitigation evidence. But even so, I am at a loss to understand how the California Supreme Court unreasonably applied any United States Supreme Court precedent. The pre-crime/post-crime mitigating evidence dichotomy offered by the majority is the majority's own untenable invention— not that of the United States Supreme Court. AEDPA commands that we show more respect for our counterparts in the California judiciary. We do not have the right to ignore AEDPA, however much our personal sense of justice urges us to overturn Payton's sentence. We are not Congress. We are not the United States Supreme Court.

Reasonable minds might disagree as to whether Payton's sentence was based on constitutionally adequate jury instructions, especially considering the prosecutor's erroneous arguments to the jury. But that is not the question before us. For us to grant Payton's petition, the California Supreme Court's decision must have been *objectively unreasonable,* which means "more than incorrect or erroneous." *Andrade,* 538. U.S. 63, 123 S.Ct. at 1174. Under this standard it was not. *Boyde*— as well as *Penry* and *Skipper*—gave the California Supreme Court plenty of latitude to reach the decision that it reasonably made. The California Supreme Court is just as qualified as we are to distinguish and apply United States Supreme Court precedent. The majority's "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law." *Visciotti,* 537 U.S. at 24, 123 S.Ct. 357.

## II

We turn to the question of harmless error, which the majority hastily jettisons. The prosecutor may have been wrong in urging the jury to disregard the defendant's post-arrest claim of religious conversion, but we must not forget the factual context in which the jury rendered its decision. In the wee hours of the morning of May 26, 1980, William Charles Payton arrived at the Garden Grove, California, home of Patricia Pensinger. Payton, who had once been a boarder in Pensinger's home, found Pensinger awake and working on a cross-word puzzle in the kitchen. He informed her that he was experiencing car trouble. Pensinger graciously welcomed Payton into her home and offered him some beer, which he drank while talking with Pensinger until about 4:50 a.m. During their conversation, Pamela Montgomery, a boarder temporarily residing at Pensinger's home, entered the kitchen. Pensinger introduced her to Payton. Montgomery, who was staying with Pensinger while her husband was on duty with the National Guard, filled a glass with water, then left the kitchen and returned to her bedroom. Payton asked Pensinger if he could sleep on the living room couch and Pensinger said he could.

While everyone else in the house was fast asleep, Payton repaid Pensinger for her hospitality by waking her with two blows to her back, stabbing her forty times on her face, neck, back and chest, and stabbing her ten-year-old son, Blaine, twenty-three times in the face, neck and back. Miraculously, both Pensinger and her son survived. Pamela Montgomery was not so lucky. Her body was found after Payton fled the Pensinger residence. He returned to his own home where his wife saw him covered in blood. Forensic evidence suggested either that Payton stabbed Montgomery twelve times during sexual intercourse, or that he raped her while she lay comatose and bleeding to death from her wounds.

William Charles Payton did not suffer from a mental illness; he was not "made bad" by his upbringing; he was not a generally good person who did one heinous act out of character; and he was ably defended by competent counsel. On this record, the jury could easily find that William Charles Payton was a vile human being who chose a despicable path in life that culminated in a series of heinous crimes on the morning of May 26, 1980.

Had Payton changed by the time of his trial and sentencing? Who knows? We do know that the jury heard evidence of his post-crime religious conversion. The conversion may have counted for something, but it was up to a jury two decades ago to decide how to value his fortuitous epiphany. Certainly, there might have been substantial doubt concerning Payton's sincerity given the timing of his religious conversion, but even if his commitment were sincere, the jury may very well have concluded that such matters concerned Payton's soul, not his life.

Our job today is to ask: "Do [we, as judges], think that the error substantially influenced the jury's decision?" *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct.

992, 130 L.Ed.2d 947 (1995). Common sense tells us the answer is no. Abstract legal discussions are important in the development of the law, but so is the ability to look at the impact of those abstract decisions in the context of the real world. Any legal errors in this case were harmless in relation to the acts committed by the man who stood before the jury and asked it to mitigate his sentence based solely on his change of heart after he was caught.

III

Twelve jurors listened to Payton's evidence in mitigation and determined it was not sufficient to avoid a sentence of death. Twelve judges carefully examined the penalty phase instructions and found them to be constitutionally adequate. Six judges disagree. Objectively, who is being unreasonable?