Filed 3/25/15  P. v. Martinez CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER MICHAEL MARTINEZ,<br><br>        Defendant and Appellant. | A136828<br><br>(Sonoma County<br>Super. Ct. No. SCR589717) |

Defendant Christopher Michael Martinez was convicted by a jury of burglary of an occupied dwelling and misdemeanor vandalism.  The prosecutor pursued the burglary charge on the theory that defendant entered the dwelling with intent to rape the occupant, whom we refer to as Jane Doe.  On appeal, defendant argues that the court erred by excluding evidence of an earlier incident involving Jane Doe in which she displayed an angry outburst while intoxicated.  He also contends there is insufficient evidence to show that he intended to rape Jane Doe at the time he entered the dwelling.  We reject these contentions and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Overview*

In early March 2008, Jane Doe was out socializing with friends, one of whom was accompanied by defendant.  Jane Doe and defendant had not previously met.  Jane Doe and the others went to her home after leaving a bar in the early morning hours.  Jane Doe was intoxicated and "not herself."  The houseguests ultimately left Jane Doe's home but

1

defendant returned by himself. Jane Doe was awakened in her bed with defendant on top of her. There was evidence that Jane Doe's back door had been kicked in. A neighbor called the police after hearing Jane Doe's cries for help. When the police arrived, Jane Doe ran out of the duplex, naked and yelling that defendant was raping her. The forensic evidence presented at trial raised doubts about whether defendant had inserted his penis into Jane Doe's vagina.

Defendant claimed at trial that he returned to Jane Doe's home early in the morning hours because he was lost. According to defendant, he and Jane Doe kissed each other and fell asleep on the bed after she let him into her home. Defendant testified that he was awakened by Jane Doe yelling at him and telling him to get out of the house. The defense theory at trial was that Jane Doe was not credible and that she made up a story after she "flipped out" and realized what she had done with defendant in her drunken state.

### Procedural History

The Sonoma County District Attorney filed a six-count information charging defendant with one count of rape of an intoxicated person (Pen. Code,[1] § 261, subd. (a)(3)), three counts of forcible rape (§ 261, subd. (a)(2)), one count of first degree burglary (§§ 459, 460, subd. (a)), with an allegation that the dwelling was occupied by Jane Doe (§ 667.5, subd. (c)(21)), and one count of misdemeanor vandalism of Jane Doe's door and lock. (§ 594, subd. (a).)

The matter proceeded to trial by jury in April 2012. The jury found defendant not guilty of the rape charges but found him guilty of burglary and misdemeanor vandalism as charged in the information.

At sentencing, the court suspended imposition of judgment and placed defendant on probation subject to a variety of conditions, including that he serve 12 months in jail. Defendant timely appealed the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

Adam Pulido and Jane Doe were good friends but not lovers. On the evening of March 7, 2008, they went out together to eat, drink, and socialize. They went to a number of bars and met defendant and Mario Madrid during the course of the evening. Jane Doe knew Madrid as a friend and had gone out with him in the past. She did not know defendant.

A little after midnight, Pulido saw that Jane Doe had been drinking and noticed she was "meandering a bit" and not completely coherent. She admitted at trial that she drank at each of the three bars she visited that evening and that she was "getting buzzed" by the time they were at the third bar. Jane Doe said she only danced with Pulido, spent most of her time with him, had only passing contact with defendant, did not dance with defendant, did not pair off him with him, and did not remember touching him or being very close to him. At one point, she dropped her drink. Defendant quickly bought her a replacement drink and they started to chat. According to Jane Doe, defendant was being friendly and it would have been rude of her not to accept the drink. She was a little embarrassed she had spilled her drink and thought it was a clear sign she was intoxicated.

Jane Doe suggested that all four of them go to her home to continue partying. Pulido testified that he drove Jane Doe as well as Madrid and defendant back to her home. At the time they left the bar, Jane Doe was inebriated but was not blacking out, stumbling, or unable to stand. They arrived at Jane Doe's home at around 2:00 a.m.

Pulido went along just to make sure everything was okay. He normally would have just dropped her off but was concerned because Madrid had told him at the club that defendant wanted to pair off with Jane Doe.

At Jane Doe's home, she was more drunk and less coherent than she had been at the bar. About 15 or 20 minutes after they arrived, Pulido started drinking games in the kitchen and played them with the others for 10 or 15 minutes. Defendant was talking to Jane Doe and trying to pair off with her. They talked and got close, but Pulido did not see them kiss. According to Pulido, there was some tension because it looked like

3

defendant wanted to talk to Jane Doe, whereas she wanted to return to the main room and not talk to him.

Pulido went to the living room and eventually fell asleep on a small couch. The rest of the group joined him in the living room and began dancing.

Jane Doe testified that she did not recall what she was drinking or that she had played drinking games. She also did not remember being in the kitchen or remember how candleholders had ended up broken on the floor in the living room. Although she smoked cigarettes at the time, she did not recall smoking on a bench located on the porch in front of her home. Jane Doe did not recall kissing defendant or being affectionate with him. She testified that she was not interested in defendant.

Pulido dozed off for possibly half an hour. He awoke when he heard a crash from glass objects breaking. When he was awakened, he noticed that Jane Doe was trying to put nail polish on his lips. She thought it was funny but Pulido was upset.

Pulido said that the party was over and that everyone had to leave. He thought it was around 3:30 a.m. As Madrid and defendant collected their things, Pulido took Jane Doe back to the bedroom and put her to bed. Pulido testified that she got into bed and under the covers wearing her regular clothes. According to Jane Doe, she had changed into flannel pajama bottoms but had struggled to do so because of the effects of the alcohol. She went right to sleep.

Pulido testified that defendant returned to look for his cellphone a few minutes after he left with Madrid. Pulido helped defendant look for his phone. According to Pulido, Jane Doe came out of the bedroom when defendant returned but was "pretty out of it." She did not recall leaving her bedroom, nor did she remember defendant returning to look for his phone. After searching without success for defendant's phone, Pulido escorted defendant out the door and watched defendant walk down the street with Madrid. Pulido did not remember them having a car. After defendant left the home for a second time, Pulido locked up and double-checked everything. He checked on Jane Doe before leaving. She was inebriated, not herself, and ready just to "zonk out." He had

4

rarely seen her like that. Pulido left through the front door about 15 or 20 minutes after defendant and Madrid had left. He made sure the door was locked when he left.

Jane Doe did not know when she fell asleep or when she woke up. She was awakened with defendant on top of her in bed. His penis was in her vagina. She was naked but did not remember taking off her clothes and did not think she did. Defendant was not wearing a shirt, but she did not know if he was wearing pants. His pants could have been down or off, but they were down enough to expose his penis. According to Jane Doe, she did not awaken after first going to bed until she found defendant in bed with her. She was confused because she thought everyone had left when she went to sleep. She did not hear anyone at the door and could not have opened the door to allow defendant to enter.

She said, "Ow, what the fuck are you doing? Get off me." They slid off the bed after she began to wrestle with defendant. He landed on top of her and his penis came out of her. As they continued to struggle, defendant asked Jane Doe what she was going to do if he let her up. She told him she would call the police. He put his penis in her again and they continued to struggle with one another. She scratched at him and tried to push him away. They made their way into the kitchen, where his penis came out of her again. When Jane Doe saw a light on in her neighbor's home, she yelled, "Neighbor, help." In the kitchen, defendant's penis penetrated her vagina a third time. She was finally able to get defendant off her, ran through the living room, and left through the front door. Jane Doe estimated the entire incident took between 10 and 20 minutes. He penetrated her at least three times.

Nicole Case was Jane Doe's next door neighbor at the time. Their homes were duplexes that shared a wall. In the middle of the night, Case was awakened by a boom that shook her bed. She thought there might have been an earthquake. A few moments after the loud noise, she heard what sounded like furniture being moved. The noises were coming from Jane Doe's home. Case heard Jane Doe say, "What are you doing?" She sat and listened for a couple of minutes to see if something was wrong or if Jane Doe was simply being loud. The next thing she heard was Jane Doe yelling, "Help, neighbor,

5

help." Case jumped out of bed and called 911. She saw a police car arrive and then saw Jane Doe run naked out of her home.

The 911 call was logged at 4:30 a.m. Three police officers responded to the call. The first officer to arrive stood at Jane Doe's front door and heard a female voice at the rear of the home saying, "Get off me, let me go." The door opened and Jane Doe ran out, collided with the officer, and fell. She was naked. She pointed inside the home and said, "He's raping me." Jane Doe was hyperventilating, had trouble speaking, and appeared frightened, emotional, and distraught. The officer looked inside and saw defendant running toward the front door from the kitchen. Defendant was wearing pants and socks but no shirt or shoes.

Another officer brought Jane Doe back to her bedroom, where she dressed and spoke to the officer for about 10 to 15 minutes. The officer did not notice Jane Doe slurring her words and did not smell alcohol on her, but Jane Doe admitted that she had been "ripped." She told the officer she had gone to sleep while defendant and Madrid were there and the next thing she knew she was being awakened by defendant violently having sex with her. She repeated that statement a few more times but also said at one point she had been awake, sitting and talking with defendant, at the time he started having sex with her. Although her stories appeared to conflict, she may have been trying to clarify. She later repeated that she had been awakened by him having sex with her. She denied flirting with defendant and said she would not do that because it would be cheating. She said she had recently broken up with a boyfriend and was trying to work things out.

An officer drove Jane Doe to the hospital after she consented to undergo a sexual assault examination. She told the nurse who conducted the examination that she had been raped three times, first on the bed, then on the floor, and a third time when she was tackled in the living room. Jane Doe had various scratches and bruises on her body; they were consistent with her account of being assaulted but could have been inflicted if the other person was defending himself. Jane Doe denied having intercourse in the five days prior to the assault. At trial, Jane Doe testified that she had had sex with her boyfriend

6

three days before, and explained that she answered the nurse's question as she did during the examination because she thought the question was whether she had had intercourse in the prior two days. The nurse observed tenderness in the area near Jane Doe's vagina and interpreted it as having been caused by an assailant hitting the area with his penis while trying but failing to penetrate the vagina. The nurse admitted there was no way to confirm whether the tenderness in the vaginal area came from the alleged attack or the prior consensual sex.

Michael Waite, a longtime friend of Jane Doe's, met her at the hospital after the sexual assault exam was completed. They returned to Jane Doe's home. Waite wanted to open the back door to allow some air into the home. He noticed the deadbolt from the back door was on the floor near the door. The door was wedged and would not move when Waite tried to open it. He walked out the front door and went to the back to see what was wrong. He still could not open the door from the outside. He noticed footprints on the door. He returned inside and eventually opened the door after applying force to it. After he opened the door, he noticed that it was damaged. The whole side of the door was split and the latching mechanism was missing.

A detective went to Jane Doe's home and inspected the damage to the back door. There were several footprints on the door, with a shoeprint just to the right of the doorknob. The door was splintered and the doorjamb was damaged where the deadbolt would have been housed. A criminalist made test prints from the sole of defendant's shoes and compared them to photos of the shoeprints from the door. Defendant's shoes had the same size, shape, design, and tread pattern as the prints on the door, although there was insufficient detail to confirm that defendant's shoes made the prints.

Pulido testified at trial that he attempted to reach Jane Doe after the incident but did not get in touch with her until about a week afterwards. Jane Doe told him that she did not believe there was any penetration but she was not sure. She was hesitant to talk about anything and looked like she had not slept in weeks. About six days later, when they spoke for a second time about the incident, Jane Doe said there had been penetration but that she had been too embarrassed to tell Pulido earlier.

The DNA evidence offered at trial showed that a major contributor of DNA found on the tip and shaft of defendant's penis was consistent with defendant's DNA, with a minor contributor of DNA that was consistent with Jane Doe's DNA. The DNA consistent with Jane Doe's DNA could have come from saliva, could have been transferred by kissing, and did not necessarily come from Jane Doe's vagina. A swab taken from Jane Doe's vagina included sperm with DNA that was not from defendant, as well as fluids other than sperm that were consistent with Jane Doe's DNA. The DNA from the sperm was consistent with the DNA of Scott Mowrey, who was the person with whom Jane Doe had last had consensual sex.

A detective spoke with defendant on the morning after the incident. Defendant was cooperative in the interview as well as in two more interviews that the detective conducted. Defendant had scratches on his neck, in front of his ear, near his right shoulder, and on his left shoulder. According to defendant, he told the detective in the first interview that DNA tests would be negative because he had not had intercourse with Jane Doe.

*Defense Case*

A forensic serologist testified as an expert for the defense concerning the DNA evidence. The defense expert testified that amylase comes in two primary types. Type 1 comes from saliva, perspiration, and breast milk. All other bodily fluids contain type 2. Vaginal fluid always contains type 2 and may contain type 1. The expert found amylase type 1 but not type 2 in the sample taken from the shaft of defendant's penis. The expert concluded the amylase on the shaft of the penis came from saliva. If the penis had been inserted three times into a vagina, the expert would have expected to find amylase type 2 from vaginal secretions. The expert also opined that defendant's penis would have had DNA from Mowery's sperm cells if it had been inserted in Jane Doe's vagina.

Madrid testified for the defense. In contrast to Pulido's testimony, he claimed that he had driven to Jane Doe's home himself after stopping on the way to buy a bottle of vodka. He testified that he and defendant arrived at the home after Jane Doe and Pulido. Everyone was drinking and they may have smoked marijuana. According to Madrid,

8

Jane Doe and defendant were attracted to each other, which made him jealous because he had dated Jane Doe in the past and was still interested in her. Madrid testified that defendant and Jane Doe danced and kissed. After Pulido told everyone to leave, Madrid and defendant left and went to Madrid's car. Defendant returned to Jane Doe's home to search for his cellphone while Madrid waited in the car. Madrid testified that he saw Jane Doe kiss defendant in front of her home. Because that made him angry, Madrid drove off and left defendant behind.

Defendant testified in his own defense at trial. He said that he had danced with Jane Doe at the club for an hour and a half or two hours after she spilled her drink and he bought her another. According to defendant, Madrid drove him to Jane Doe's home after they left the club. He did not intend to have sex with her that evening but he was definitely interested in her and hoped to start a good friendship. Defendant testified that he and Jane Doe smoked cigarettes two or three times on the front porch. They talked a lot and kissed a couple of times in the kitchen. After a cigarette break, they went to the living room and danced. Defendant tried to catch Jane Doe after she lost her balance but he, too, lost his balance, and they knocked over "a bunch of things" as they fell to the floor. At that point, Pulido woke up and told everyone they had to leave.

According to defendant, he realized he did not have his cellphone when he got into Madrid's car. When he went back to look for the phone, Jane Doe and Pulido were arguing with each other. Pulido and Jane Doe helped him look for his phone but could not find it. Pulido told defendant he had to leave. When defendant went back outside, Madrid was gone. Defendant claimed to have gone back to Jane Doe's home another time after being left behind by Madrid. Pulido was not friendly and told defendant to find his own way home. Defendant started walking home but realized he did not know where he was. He walked back to Jane Doe's home.

Upon returning to Jane Doe's home again, he saw the living room lights on and assumed Pulido and Jane Doe were still awake and could help him figure out what to do. At trial, defendant claimed he had no idea Pulido was gone. However, defendant had previously told the detective that he realized Pulido had left by the time he returned

again. Defendant testified that he did not recall making that statement and could not explain why he would have said that.

Defendant knocked on the front door a few times but got no response, so he went around to the back door. He then knocked on the back door and a couple of windows but still got no response. He kicked and pounded on the back door to make noise and draw attention. He claimed he was trying to get in but was definitely not trying to break in. Though he admitted his foot hit the door multiple times, he claimed he was kicking at it and not trying to kick through it. Defendant acknowledged that he had not mentioned anything about the door when first interviewed by a detective. In a second interview with the detective conducted 10 days after the first interview, defendant still failed to mention anything about knocking on or kicking at the door, even after the detective showed him pictures of how the door had been broken.

After defendant stopped kicking at the back door, he made his way back to the front and saw through a window that Jane Doe was walking through the kitchen toward the front door. She opened the front door and allowed him to come in, although she was a little upset at him. Defendant tried to contact Madrid but was unsuccessful. He and Jane Doe spent a few minutes looking for his phone but eventually sat on the couch and finished their wine from earlier. They started kissing and "making out." They moved to the bedroom at Jane Doe's suggestion. They took off their shirts but she left her bra on. They lay on the bed, talking and kissing on and off. Then they fell asleep. Defendant awoke at one point but went back to sleep.

When defendant awoke again, Jane Doe was naked. She was yelling at him, asking what he was doing in her house, and telling him to get out. Confused and trying to figure out what was going on, he told her he would leave. While he was trying to collect his things, she started to hit him. He had to grab her wrists to stop her from hitting him. He did not recall pinning her to the floor, although he had previously told the detective that he had pinned her to the floor in the bathroom. She tried to bite his hands, so he let go. As he moved toward the door, she continued to hit him. He held her wrists in the hallway while trying to pick up his shoes. He told her he was going to leave and asked

10

her if she would stop hitting him if he let her go.  She appeared to quiet down at that point.  As he released her she sprinted for the front door.

Four character witnesses who testified for the defense stated that defendant was respectful of women even when he had been drinking.

## DISCUSSION

**1.** ***Exclusion of Evidence Concerning a Previous, Drunken Outburst by Jane Doe***

Defendant contends the trial court erred by excluding evidence that in December 2007, about three months before the date of the charged crimes, Jane Doe "erupted with an inexplicable outburst of anger while intoxicated."  As we explain, the court did not abuse its discretion in excluding the evidence, which the court concluded was substantially more prejudicial than probative.  Even if the evidence tended to show that Jane Doe got angry when she drank—a highly dubious premise—the evidence has no tendency to show that Jane Doe would make a false allegation of sexual assault after drinking or becoming angry.

### A. Background

As described above, Madrid testified for the defense and was at Jane Doe's home with defendant and Pulido on the night she claimed to have been sexually assaulted by defendant.  At a hearing outside the presence of the jury, Madrid testified that he "ran into" Jane Doe at a bar in December 2007.  From the bar they went to a party at the home of Madrid's friend, arriving there between midnight and 2:00 a.m.  They had been drinking earlier in the evening and continued drinking at the friend's house.  The home had an open floor plan in which the kitchen and living room were in one area.

According to Madrid, Jane Doe suddenly started punching and kicking the door to the pantry in the kitchen.  Madrid described her as angry, "freaking out," "having a fit," "flipped out," and "extremely upset."  She used profanity, saying things such as "mother fucking" and "fuck you."  Madrid could not remember what else she may have said.

Madrid testified that Jane Doe's anger seemed "largely unprovoked."  He had not seen or heard anything that would have accounted for the outburst.  When asked to specify what was going on immediately before the episode, Madrid responded that it was

11

a long time ago and that he could not "remember exactly what was going on." He said that "[i]t didn't seem like anything unusual had gone down like there was an altercation or anything." He could not remember exactly where he was in relation to Jane Doe, but he believed he was in the kitchen at the time of the outburst.

Madrid restrained Jane Doe by grabbing her wrists or shoulders. She struggled against him, still attempting to direct her aggression toward the door. The whole incident took place in about 15 to 20 seconds. Everything was fine after Madrid took her outside the house.

Defense counsel suggested the episode was similar to the incident at Jane Doe's house in March 2008. He argued it was consistent with defendant's story that Jane Doe "woke up and was freaking out for no apparent reason that he was aware of." Counsel urged that the evidence was relevant to show that Jane Doe has an anger problem when she drinks. He argued the evidence bore on her character and claimed the jury had a right to know that Jane Doe had recently engaged in similar "losing it behavior" while drinking.

The court rejected the proffer with this explanation: "The Court will weigh this issue under Evidence Code Section 352. There would be prejudice to the district attorney. This is a totally unrelated incident involving some drinking and what could be characterized as less than proper behavior, but it certainly doesn't seem to have any connection with the incident. You can't in fairness jump from one incident where someone had been drinking, was upset about something and kicking at a door to the conclusion that that person would attack a person in bed and claim rape. That's a huge leap from one incident. I think that it has marginal relevance, it has pretty significant prejudice. Weighing those two things, the Court does rule that it should not come in."

## B. Analysis

"Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Riggs* (2008) 44 Cal.4th 248,

12

290.)  We review a ruling concerning the admissibility of evidence for abuse of discretion.[2]  (*Ibid.*)

Defendant argues on appeal that the "proffered evidence demonstrated that Jane Doe had some kind of physiological condition that intermittently manifested itself in an unprovoked eruption of alcohol-fueled anger."  He goes on to claim that the evidence corroborated "[defendant]'s testimony that Jane Doe erupted in anger toward him without any triggering conduct on his part."  We are not persuaded.

As an initial matter, the proffered evidence did not necessarily show that Jane Doe was unprovoked in the earlier episode.  It simply showed that Madrid did not remember or was not aware of what may have caused Jane Doe to become angry.  Moreover, there is no indication that Madrid ever sought to learn why she was upset.  The evidence does not support a reliable conclusion that Jane Doe simply erupted in anger for no reason while intoxicated.

Further, even if Jane Doe's anger was unprovoked, the evidence still was not significantly probative.  It simply showed that Jane Doe had *once* before gotten violently angry after drinking.  There was nothing to indicate she was regularly prone to anger when she was intoxicated.  After all, Madrid claimed to have known Jane Doe for years and at one time was in a casual dating relationship with her, yet he only observed one instance of purportedly unprovoked anger.  There was no proffer of medical or psychological expert opinion to suggest that this one episode would support a conclusion that Jane Doe suffered from a physiological condition that would manifest itself when she drank alcohol.  Instead, defendant asks us to assume that a layperson could reasonably

---

[2]In support of his claim on appeal, defendant relies in part on Evidence Code section 1103, subdivision (a)(1), which allows character evidence pertaining to the victim to be admitted in a criminal action under certain circumstances when offered to prove that the victim acted in a manner consistent with the character trait established by the evidence.  Although the Evidence Code allows such evidence to be admitted under specified conditions, the admissibility of character evidence, like other types of evidence, is a matter committed to the court's discretion.  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827–828.)  We will not disturb the court's evidentiary ruling absent an abuse of discretion.  (*Id*. at p. 827.)

draw an inference from this one episode that Jane Doe had a condition that would cause her to react in a particular way. Such a speculative inference is not relevant evidence. (See *People v. Stitely* (2005) 35 Cal.4th 514, 549–550.)

In addition, the earlier episode was not substantially similar to what happened in Jane Doe's encounter with defendant. The fact that Jane Doe would angrily kick a pantry door without provocation did not tend to show that she would make false rape accusations. In the episode described by Madrid, Jane Doe did not make false assault claims or direct her anger at another individual. The entire episode lasted no more than 20 seconds, and she calmed down after Madrid restrained her.

Evidence that Jane Doe was somehow prone to irrational outbursts was also inconsistent with the defense theory at trial. Defense counsel did not suggest she acted in an alcohol-infused rage. Instead, counsel argued to the jury that Jane Doe falsely accused defendant of rape because (1) she did not remember consenting to have sexual relations and regretted her actions when she awoke, and (2) she wanted to hide from her boyfriend what she had done. Building on these theories, counsel argued that Jane Doe was stuck with a story that she had told the police, family, and friends. The prior angry episode did not fit into the defense narrative. In short, the proffered evidence was not particularly relevant.

In contrast to its minimal probative value, the evidence was prejudicial. Admitting the evidence would have encouraged the jury to conclude—as defendant himself has— that Jane Doe was an angry, irrational drunk. In *People v. Stitely, supra,* 35 Cal.4th 514, the defense sought to introduce evidence that the decedent in a case of sexual assault and murder had previously left a bar with a man who was not her husband. (*Id.* at pp. 547–548.) In combination with evidence the decedent was intoxicated when she left the bar with the defendant, the defense claimed the proffered evidence tended to show the decedent had engaged in consensual sexual relations with the defendant. (*Ibid.*) The trial court excluded the evidence, concluding it was unduly prejudicial in that it suggested the decedent was promiscuous based upon " 'one very amorphous incident' " about which little was known. (*Id.* at p. 548.) The Supreme Court found no abuse of discretion,

14

reasoning that the inference the defense sought to draw was highly speculative but substantially prejudicial. (*Ibid.*) Likewise, in this case the inference that defendant draws from the evidence is speculative and highly prejudicial. " 'The court is not required to admit evidence that merely makes the victim of a crime look bad.' " (*Ibid.*) Accordingly, we conclude the trial court did not abuse its discretion in excluding the proffered evidence.

The cases relied upon by defendant do not alter our conclusion. In one case involving a defendant charged with sexually molesting a minor, a federal appeals court concluded the trial court erred in excluding evidence that the minor had falsely accused another person of sexual molestation. (*Franklin v. Henry* (9th Cir. 2001) 122 F.3d 1270, 1272–1273, overruled on other grounds in *Payton v. Woodford* (9th Cir. 2003) 346 F.3d 1204, 1217, fn. 18.) Similarly in *Fowler v. Sacramento County Sheriff's Department* (9th Cir. 2005) 421 F.3d 1027, 1041, an appeals court held that the trial court erred in precluding cross-examination of the victim concerning prior, unfounded allegations of sexual molestation. This case is clearly distinguishable from *Franklin* and *Fowler*. One can fairly infer that a person who claims to have been molested may not be truthful in light of evidence that the person previously lied about being molested. The evidence plainly bears upon the victim's credibility. Here, the proffered evidence did not tend to show that Jane Doe was untruthful or that she was prone to making up stories about being sexually assaulted. She did not lie on the first occasion. She was simply angry.

*People v. Wright* (1985) 39 Cal.3d 576 likewise does not assist defendant. In *Wright,* a murder case, the defendant claimed he acted in self-defense. The court allowed the defense to introduce evidence that the decedent had reacted violently when he had been arrested previously, but the court excluded evidence that the decedent was under the influence of heroin at the time of the earlier arrest. (*Id.* at pp. 582–583, 586.) The ruling admitting the evidence of the violent reaction during the prior arrest was unchallenged. The Supreme Court noted that " 'evidence of the aggressive and violent character of the victim is admissible' " when a defendant claims self-defense in a homicide case. (*Id.* at p. 587.) However, the court upheld the exclusion of the heroin evidence, concluding it

was more prejudicial than probative. Among other things, the court noted that the circumstances of the earlier arrest were not similar to the circumstances of the murder, and the victim's behavior could have been explained by circumstances other than being under the influence of heroin. (*Ibid.*) In this case, unlike in *Wright,* the issue is not whether Jane Doe had a violent character when confronted. Insofar as *Wright* is relevant, it tends to show that evidence concerning an incident that is not similar to the circumstances of the charged crime and that seeks to establish a questionable inference— such as a conclusion that the victim acted in a particular way due to being under the influence—is more prejudicial than probative.

## 2. *Sufficiency of the Evidence Supporting Burglary Conviction*

Defendant contends the evidence was insufficient to support his burglary conviction. Given what he describes as "equivocal evidence regarding entry," he claims the evidence was insufficient to establish that he intended to rape Jane Doe at the time he entered her home. We disagree.

In reviewing the sufficiency of the evidence to support a conviction, "we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212.)

In order to sustain a conviction for burglary of an inhabited dwelling under section 459, the prosecutor must establish that the defendant entered the dwelling with intent to commit a felony. In this case, the jury was instructed that it had to find that defendant intended to commit forcible rape or rape of an intoxicated person *when* he entered Jane Doe's home. (See *People v. Bard* (1968) 70 Cal.2d 3, 5 (*Bard*) [relevant inquiry in burglary case is defendant's intent at the time of entry, regardless of whether felonious intent is carried out].)

Defendant claims the evidence of his intent upon entering Jane Doe's home for the last time is equivocal because it is unclear whether he entered by breaking in the back door. He correctly summarizes the prosecutor's theory as one in which defendant

16

attempted to rape Jane Doe after breaking in the back door. But he claims the theory is problematic because "it was contradicted by the undisputed evidence of Jane Doe's friend, Michael Waite, who brought her home from the hospital on the morning of March 8 . . . ." Because he had such difficulty opening the door when he arrived at Jane Doe's home, Waite concluded the "door wouldn't open that night. It was wedged shut." Calling Waite's testimony "plainly inconsistent with the prosecutor's theory," defendant concludes "any inference of intent to rape that would be otherwise available from the fact of a forced entry is absent here, because the record indicates that while [defendant] kicked at the door, that kicking broke the door in a manner that rendered it 'clearly wedged' closed according to Waite."

Defendant's argument fails for a simple reason—the jury could have reasonably concluded that defendant kicked in the door, entered through it, and then closed it himself, causing it to become wedged. The fact the door was wedged shut the following day would not compel a reasonable jury to reject the prosecutor's theory of forced entry. Despite defendant's claim he was just trying to attract Jane Doe's attention by kicking the back door, his kicks were sufficiently numerous, forceful, and well-directed to knock out the dead bolt and split the side of the door. The finding of a forcible entry was supported by the testimony of Nicole Case, Jane Doe's neighbor. She heard a noise so loud she thought there had been an earthquake. In light of the extensive damage to Jane Doe's back door, the jury could have reasonably concluded the noise was caused by defendant kicking in the door, particularly in light of Jane Doe's testimony that she did not open the door for defendant or invite him in when he returned a final time.

Case's description of the events that transpired immediately after hearing the loud noise are directly at odds with defendant's description of what happened after Jane Doe purportedly allowed him entry into her home. Whereas defendant claimed that he and Jane Doe drank wine, kissed, and fell asleep together after he entered the home, Case heard what sounded like furniture being moved shortly after hearing the loud noise, then heard Jane Doe's question, "What are you doing?" A few minutes later, Jane Doe cried

17

for help. The jury could have reasonably concluded that defendant succeeded in entering the home by kicking in the back door and then immediately attempted to rape Jane Doe.

Further, defendant denied in his interviews with police that he had kicked the door, even when a detective showed him pictures of how it had been broken. The jury could have reasonably concluded defendant hid the truth from the detective because he knew it showed that he broke into the home.

The defense could not explain why Jane Doe would have reacted as she did if he had entered the home with her consent. She struggled with defendant, called for help, and ran out of her home naked in the middle of the night. Although the defense at trial was that she was upset and regretted having allowed defendant to be sexually intimate with her, that theory was far from convincing. Even if it had been true, there was no reason for her to run panicked from her home and summon the police. The jury could have reasonably rejected the defense theory and concluded the events that transpired after defendant entered the home a final time corroborated the inference that he entered with intent to rape Jane Doe.

The case of *Bard, supra,* 70 Cal.2d 3, is instructive. There, the complaining witness awoke at 2:55 a.m. to find the defendant fondling her in bed. (*Id.* at p. 4.) She later found that a screen on the bathroom window had been removed. (*Ibid.*) The court in *Bard* found sufficient evidence to support burglary under a theory that the defendant entered the home with intent to commit rape, despite the defendant's claim that it was "just as consistent" to conclude based upon the evidence that he entered with the intent to seduce the victim and have consensual sex with her. (*Id.* at pp. 5–6.) The court reasoned: "[I]t is not the function of this court to determine whether a different finding would be just as reasonable as the one the trial court made; rather, this court simply determines whether there is substantial evidence, including inferences reasonably deduced from the facts in evidence, to support the finding actually made." (*Id.* at p. 6.) Here, likewise, it is not our role to assess whether one could reasonably conclude based upon the evidence that defendant entered with Jane Doe's consent and did not intend to rape her at the time he entered. Because there is substantial evidence to support the

conclusion that he harbored the intent to rape Jane Doe at the time he entered her home, it is irrelevant that evidence offered by defendant might support a different conclusion.

Defendant claims *Bard* is distinguishable because the defendant was a complete stranger to the victim in that case. We do not agree. The fact the defendant was a stranger was not dispositive; it was simply one more fact making "it more reasonable" to conclude the defendant had the intent to rape rather than seduce the victim. (*Bard, supra,* 70 Cal.2d at p. 6.) Here, unlike in *Bard,* the entry was much more violent and defendant proceeded to assault and not merely fondle Jane Doe. Further, given that defendant knew Jane Doe was extremely intoxicated, and in light of his admitted sexual attraction to her, the facts in this case make the finding of an intent to rape stronger, not weaker, than the facts in *Bard.*

Accordingly, we conclude the evidence was sufficient to support the burglary conviction premised upon defendant's intent to rape Jane Doe at the time he entered her home.

## DISPOSITION

The judgment is affirmed.

 

                                    _____

                                    McGuiness, P.J.

We concur:

_____

Pollak, J.

_____

Siggins, J.